**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-17-08020-001-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Imani Magnolia, also known as Marlene Frances Rodriguez Castelluccio, | |
| Defendant. | |

Defendant Imani Magnolia suffers from a delusional disorder that renders her not competent to stand trial. The government seeks to administer antipsychotic drugs in order to restore her to competency, but she refuses medication. The Court held an evidentiary hearing on October 23, 2018, to determine whether Defendant should be involuntarily medicated under the principles of *Sell v. United States*, 539 U.S. 166 (2003). Doc. 145. Having considered the relevant evidence and case law, the Court finds that the government has not shown that Defendant should be medicated against her will.

**I.     Background.**

Defendant has been indicted on three counts of filing false liens against federal employees and one count of conspiracy to do the same in violation of 18 U.S.C. § 1521. Doc. 14. As discussed below, the charges are based on Defendant's filing of liens on the real property of three postal workers. Doc. 2 at 6.

On November 17, 2016, Defendant and her brother (the co-defendant in this case) went to Camping World RV Sales in Bellmont, Arizona, to buy a motor home and trailer

for approximately $330,000. *Id.* at 3-4. They attempted to pay with a "promissory note" they had created. *Id.* at 4. The note contained Defendant's social security number, purporting to be an account number, and claimed to draw on the account of Jacob J. Lew, Secretary of the U.S. Treasury. *Id.* Camping World and Chase Bank refused to accept the note as payment. *Id.*

Defendant and her brother then attempted to use the promissory note to obtain money orders from the post office, but were declined. *Id.* at 5. They continued to visit the post office and were denied services because they would not present valid identification. *Id.* at 6.

In mid-December 2016, three postal employees received electronic invoices in the amount of $34,098,000 from trusts created by Defendant. *Id.* at 7. On December 28, 2016, Defendant filed a 15-page document with the Coconino County Recorder's Office which placed liens on the real property of the three postal workers and others who are not federal employees. *Id.* The liens purported to secure the amounts Defendant claimed to be owed by these individuals. *Id.*

Defendant and her brother were arrested in January 2017. Docs. 24-25. Defendant's brother later pled guilty to count one of the indictment and was sentenced to 15 months in prison. Docs. 48-50, 86. At her attorney's request, Defendant was evaluated for competency by clinical psychologist John Walker, who found that she was suffering from a delusional disorder, mixed type. Doc. 55-2. During the evaluation, Defendant stated her beliefs that the United States is a corporation which operates under a term of international bankruptcy and anyone "in the higher level of intelligence" would know this, and that she is a "secured party creditor" of the United States and "a bonded official [with] an oath to syntax and structure." *Id.* at 2. She further stated that the sovereign citizens movement she is alleged to follow consists of "intelligent people who know what's going on," and the government wants to "suppress people who know things." *Id.* With respect to the charges against her, Defendant claimed that "God placed

[the] false liens . . . and it's God's intent." *Id.* Given the severity of her delusional thinking, Dr. Walker concluded that Defendant was not competent to stand trial. *Id.* at 4.

The Court held a competency hearing on July 11, 2017. Doc. 60. The government argued that Defendant's sovereign citizen views do not render her clinically delusional. Dr. Walker testified that Defendant's delusional beliefs go beyond those of a typical member of the sovereign citizens movement, noting that Defendant stated during her evaluation that she is an empress, her brother is heir to the throne of Babylon, and the undersigned judge answers to the Queen of England. Doc. 63 at 1-2; *see* Doc. 55-2 at 2-4. The Court found Defendant not competent to stand trial and committed her to the custody of the Attorney General to determine whether she could be restored to competency pursuant to 18 U.S.C. § 4241(d). Doc. 63 at 2.

Defendant was transferred to the Bureau of Prisons' Federal Medical Center ("FMC") at Carswell, Texas, and evaluated by forensic psychologist Amor Correa. Doc. 95. Dr. Correa diagnosed Defendant with delusional disorder, grandiose and persecutory type. *Id.* at 12. The diagnosis was based in part on Defendant's firmly held beliefs about vast government conspiracies and that she is a trustee, ambassador, postmaster, notary, and judge for her own nation. *Id.* at 9-12. Dr. Correa concluded that Defendant was not competent to stand trial, but that further treatment, including psychotropic medication, might restore her competency. *Id*. at 12. Dr. Correa requested that Defendant stay at Carswell so staff could encourage her to take medication. *Id.*

On December 22, 2017, FMC staff psychiatrist Gary Etter prepared a psychiatric treatment proposal in which he recommended involuntary medication in the form of injectable antipsychotic drugs. Ex. 4(d).[1] An administrative hearing was held on January 4, 2018. Ex. 4(b). Drs. Etter and Correa presented the case for involuntary medication to FMC psychiatrist Jose Silvas, who approved the proposed treatment. *Id.* Defendant's administrative appeal was denied. Exs. 4(f)-(h).

---

[1] "Ex." Refers to exhibits presented during the *Sell* hearing in this case.

After receiving Dr. Correa's recommendation that Defendant stay at Carswell, the Court held a status hearing on January 16, 2018, and ordered that Defendant remain there until March 16, 2018, to see if further efforts at restoring her competency would be successful. Docs. 94-96. Defendant continued to refuse medication, and her condition did not improve. Doc. 98.

On March 8, 2018, the Court ordered a dangerous assessment pursuant to 18 U.S.C. § 4246. Doc. 99. Defendant was again evaluated by Dr. Correa, who found that Defendant's release from custody would pose no danger to herself or others. Doc. 121.

On April 20, 2018, the government filed a request for a *Sell* hearing. Doc. 107. The hearing was delayed by defense counsel's involvement in a lengthy federal trial. Following the trial, on July 30, 2018, the Court met with counsel and agreed to address the first *Sell* factor – the importance of the governmental interests at stake – before proceeding further. Doc. 120. The Court found that the first *Sell* factor is satisfied in this case, and set a status hearing for August 31, 2018, at which the scope of the hearing on the remaining *Sell* factors and the appointment of a guardian ad litem were discussed. Docs. 123, 128. The Court scheduled the second *Sell* hearing for October 23, 2018, and appointed Kevin Burns, a CJA panel attorney, as guardian ad litem for Defendant. Docs. 128, 135.

Mr. Burns and counsel for Defendant, Ashley Adams, appeared at the *Sell* hearing on behalf of Defendant, who was also present. Doc. 145. Members of Defendant's family participated by phone. Defendant expressed certain views about the proceeding and her competency, and submitted a written statement of facts. Doc. 146. Defendant's statements at the hearing supported the diagnosis of delusional disorder. Drs. Correa and Silvas testified on behalf of the government by video conference. *Id.* The Court took the matter under advisement and stated that it would issue a written order addressing the remaining *Sell* factors. This is that order.[2]

---

[2] The government offered eight exhibits that were admitted into evidence without

## II. Legal Standard.

Under *Sell*, the government cannot involuntarily medicate a mentally ill defendant for the purpose of rendering her competent to stand trial unless it proves that (1) "*important* governmental interests are at stake," (2) "involuntary medication will *significantly further*" those interests, (3) "involuntary medication is *necessary* to further those interests," and (4) "administration of the drugs is *medically appropriate*." *Sell*, 539 U.S. at 180-81 (emphasis in original). The government must establish each *Sell* factor by clear and convincing evidence. *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010). The Ninth Circuit has instructed that involuntary medication is warranted only in "rare circumstances" and that *Sell* orders are "disfavored." *Id*. at 687, 689; *see United States v. Onuoha*, 820 F.3d 1049, 1060 (9th Cir. 2016); *United States v. Rivera-Guerrero*, 426 F.3d 1130, 1137 (9th Cir. 2005).

## III. Discussion.

The Court began the *Sell* hearing by confirming the sufficiency of Mr. Burns's performance as guardian ad litem for Defendant. Mr. Burns stated that he had met with Defendant multiple times, had talked to several of her relatives, and had discussed his views with defense counsel. He agreed with the incompetency finding, noting that Defendant's delusional disorder likely existed at the time of the alleged crimes and that Defendant firmly believes in her competency. He concluded that it is in Defendant's long-term best interest to be forcibly medicated because she will continue to suffer from delusions without medication. At Defendant's request, defense counsel Adams opposed forced medication.

Even with the guardian's view that medication would be in Defendant's long term best interest, the Court concludes that the *Sell* factors must be satisfied before the

---

objection, including Dr. Walker's competency evaluation report (Ex. 8), Dr. Correa's forensic evaluation reports (Exs. 1-3, 4(c)), Dr. Etter's treatment proposal (Ex. 4(b)), Dr. Silvas's administrative hearing report (Ex. 4(d)), the curricula vitae for Drs. Correa and Silvas (Exs. 5-6), and an article titled "The *Sell* Effect: Involuntary Medication Treatment is a 'Clear and Convincing Success'" (Ex. 7). Although the government had stated that Dr. Silvas would prepare a report regarding the proposed medication and potential side effects (Doc. 127 at 2), Dr. Silvas ultimately elected not to prepare a report.

government medicates her against her will. Evidence at the hearing made clear that medicating Defendant would involve repeatedly injecting her with psychotropic drugs, which she opposes. The forcible injection of drugs would constitute a significant infringement of Defendant's personal liberty, and the Court cannot conclude that she loses her liberty interest by virtue of being incompetent to stand trial. The *Sell* "factors do not represent a balancing test, but a set of independent requirements, each of which must be found to be true before the forcible administration of psychotropic drugs may be considered constitutionally permissible." *Ruiz-Gaxiola*, 623 F.3d at 691. At the hearing, the government agreed that it must show that each *Sell* factor is satisfied.

For the reasons stated below, the Court finds that the government has not established the second and fourth *Sell* factors by clear and convincing evidence. The Court therefore will deny the government's request to involuntarily medicate Defendant.[3]

### A. The Second *Sell* Factor.

Under the second *Sell* factor, the government must establish that involuntary medication will significantly further its interest in prosecuting Defendant for the charged offenses. *Sell*, 539 U.S. at 181. "This factor requires the government to prove two facts by clear and convincing evidence: first, 'that administration of the drugs is substantially likely to render [Defendant] competent to stand trial'; and second, 'that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with [her] ability to assist counsel in conducting a trial defense[.]'" *Ruiz-Gaxiola*, 623 F.3d at 695 (quoting *Sell*, 539 U.S. at 181).

The government has failed to establish the first fact. Dr. Silvas testified that, depending on her response to the medication, Defendant would be injected with various doses of one or more antipsychotic drugs – Risperdal (risperidone), Haldol (haloperidol

---

[3] As noted, the Court previously found that the government has satisfied the first *Sell* factor – the importance of the governmental interests at stake. Doc. 123. The Court reached this conclusion because the crimes at issue are sufficiently serious to establish important governmental interests that are not significantly lessened by mitigating circumstances. *See id.* at 4-8. Nothing presented at the *Sell* hearing caused the Court to change this view. Because the government has not satisfied the second and fourth *Sell* factors, the Court need not consider the third factor.

decanoate), and Prolixin (fluphenazine decanoate). Dr. Silvas opined that dosage levels ranging from 12.5 to 50 milligrams of these antipsychotic drugs over a period of three to six months would be substantially likely to render Defendant competent to stand trial. He stated that patients who are restored to competency generally continue with the medication when they are transferred from Carswell to the correctional facility in their local jurisdiction. But he also explained that some patients do not continue receiving medication after leaving Carswell because some correctional facilities lack the resources to forcibly administer medication, and the patients return to a delusional state as a result.

If Defendant were to be forcibly medicated and restored to competency at Carswell, she would need to be transferred to Arizona to stand trial in this case. She likely would need to arrive here at least a month before trial in order to assist her attorney in preparing the defense. She would be housed during this time and during trial at the Central Arizona Florence Correctional Complex operated by CoreCivic ("CoreCivic"). Dr. Silvas was not familiar with the medical resources at CoreCivic and made clear that Defendant would need to continue receiving medication to maintain her competency. Dr. Correa offered a similar opinion, explaining that Defendant's competency would be maintained if the proposed treatment plan were followed, but that her symptoms would return without medication because delusional thinking represents her baseline mental health condition.

The government presented no evidence that Defendant would continue to receive antipsychotic medication at CoreCivic. Without the medication, Defendant would return to her delusional thinking and would be unable to assist in her defense. Thus, the government has not shown, by clear and convincing evidence, that involuntarily medicating Defendant "is substantially likely to render [her] competent *to stand trial*." *Ruiz-Gaxiola*, 623 F.3d at 695 (emphasis added). Dr. Silvas stated that Defendant could remain at Carswell until just before trial, but this option is not feasible given that Defendant would need to meet with her counsel in Arizona in order to meaningfully

assist in preparing a defense. The government has failed to satisfy the first part of the second *Sell* factor.

The government also failed to present evidence that satisfies the second part – that administration of the drugs is substantially unlikely to have side effects that will interfere significantly with Defendant's ability to assist counsel in conducting a trial defense. *Ruiz-Gaxiola*, 623 F.3d at 695. Dr. Silvas testified about various potential side effects of the medications he recommends, as discussed below, and opined that, "by and large," the side effects could be managed so they would not interfere with a defendant's ability to work with her attorney. Court's Livenote Transcript at 107:8-12. He testified that it is "more common" that the side effects do not create problems in the court process. *Id.* at 107:18-20. But evidence that side effects "by and large" can be controlled, or that it is "more common" to be able to control them, does not show that it is "substantially unlikely" that side effects will not interfere with Defendant's ability to assist in her defense. *Ruiz-Gaxiola*, 623 F.3d at 695. Dr. Silvas's testimony on this point did not satisfy the government's burden.

### B. The Fourth *Sell* Factor.

Under the fourth *Sell* factor, involuntary medication may be authorized only if administration of the drug is "medically appropriate." *Sell*, 539 U.S. at 181. "This factor requires that the government prove by clear and convincing evidence that the proposed regime of involuntary medication is 'in the *patient's* best medical interest in light of [her] medical condition.'" *Ruiz-Gaxiola*, 623 F.3d at 703 (emphasis in original). The inquiry under the fourth factor is broader than under the second. *Id.* The Court must "consider *all* of the medical consequences of the proposed involuntary medication, including those consequences that . . . result in long term side effects [and] . . . the length of time the treatment regime must be continued in order to provide the desired medical benefit to the patient." *Id.* at 704-05 (emphasis in original); *see Onuoha*, 820 F.3d at 1059 ("penological interests do not control under the fourth *Sell* factor, which considers only 'the patient's best medical interest'" (quoting *Sell*, 539 U.S. at 181)).

Government counsel asked Dr. Silvas for his opinion on the best treatment plan for Defendant. Dr. Silvas could not answer a question framed this way, he explained, because the specific goal of the proposed treatment plan was to restore Defendant to competency for trial. Dr. Silvas explained that Carswell staff sought only to alleviate the symptoms that impair Defendant's ability to assist her attorney, not to provide a cure for her delusions or completely resolve her symptoms. He stated that the test for determining whether the dosage of medication should be adjusted is whether it would be in the "best interest of promoting restoration" to competency; long-term medical interests were not to be considered. *See* Court's Livenote Transcript at 74:9-11.

The correct consideration under the fourth *Sell* factor, however, "is not restoration, but best medical interest." *Onuoha*, 820 F.3d at 1058. "There is no medical value to a medication regime that alleviates the mental disorder . . . only for the short period of time necessary for trial preparation and the trial itself, while creating a risk of side-effects that would render the regime inappropriate for a patient's long-term treatment." *Ruiz-Gaxiola*, 623 F.3d at 706.

Dr. Silvas testified that potential side effects from each of the three antipsychotic drugs at issue include drowsiness, constipation, prolactin (increased hormone for production of breast milk), dystonia (muscle contractions that cause abnormal twisting postures), akathisia (internal restlessness and fidgeting), parkinsonism (drug-induced Parkinson's disease), and increased appetite leading to weight gain and a higher risk of diabetes. A rare but serious side effect is neuroleptic malignant syndrome, an allergic reaction that causes high temperatures and muscle rigidity. Another is tardive dyskinesia, which causes loss of muscle control throughout the body and can result in permanent disfigurement. Older patients and women – Defendant falls in both categories – generally have greater sensitivity to the side effects. Dr. Silvas stated that other patients at Carswell receiving antipsychotic medication have experienced some of these side effects. He expected Defendant to experience certain side effects if medicated, but could not predict their type or severity.

Dr. Silvas testified that most side effects can be managed by adjusting the dosage of the antipsychotic drug or with other medications (if the patient is willing to take pills), and that tardive dyskinesia is uncommon. From the patient's standpoint, however, "the medical benefit of becoming competent to stand trial for only a few months . . . and then returning to [her] prior state of [d]elusional [d]isorder could not outweigh even a miniscule risk of a disfiguring and potentially irreversible side effect." *Ruiz-Gaxiola*, 623 F.3d at 706.

The government presented no evidence that treating Defendant with antipsychotic drugs would provide a positive effect on her delusional disorder at any time after the three to six months she would be medicated at Carswell. And if "the involuntary antipsychotic medication is to be administered for so short a period, it is clearly not in 'the patient's best medical interest' to risk serious medical consequences for a benefit that, if one results at all, is only a temporary alleviation of the symptoms and not a long-term remedy for the mental illness." *Id.* Moreover, even if there was reason to believe that Defendant would receive long-term treatment after leaving Carswell, the government presented no evidence that any benefit from such treatment would outweigh the serious risks of potential side effects.

In short, the government has not shown, by clear and convincing evidence, that treatment with antipsychotic medication is in the best long-term medical interests of Defendant, the patient, rather than "the short-term institutional interests of the justice system." *Id.* at 703. The government therefore has failed to satisfy the fourth *Sell* factor. *See id.* at 705 ("Certainly, it is not medically appropriate to reduce Ruiz's delusions by involuntary medication for the period of the criminal trial if the delusions will resume upon its completion and, due to the medication, cause him to experience long-term side effects."); *Onuoha*, 820 F.3d at 1060 (fourth *Sell* factor not satisfied where the record showed that long-acting Haldol did not conform to the medical standard of care).[4]

---

[4] This case is not like *United States v. Gillenwater*, 749 F.3d 1094 (9th Cir. 2014), where the patient was "deeply disturbed by his delusions and could not lead a fulfilling life in the absence of some improvement in his condition." *Id.* at 1105. Dr. Correa

## IV. Conclusion.

Defendant has a "significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Sell*, 539 U.S. at 178 (citation omitted). The government has not made the high showing required to overcome that liberty interest.

The Court recognizes that this conclusion is unsatisfactory in several ways. Because Defendant is not competent to stand trial and cannot constitutionally be medicated against her will, the charges against her presumably will be dismissed. And because Dr. Correa has found that Defendant is not dangerous within the meaning of 18 U.S.C. § 4246(d), it appears that she cannot be committed civilly in the federal system. *See* Doc. 121; *United States v. Baker*, 807 F.2d 1315, 1319 (6th Cir. 1986) (noting that a dangerousness determination is a prerequisite to continued civil commitment under § 4246); *United States v. Rivera-Morales*, 365 F. Supp. 2d 1139, 1143 (S.D. Cal. 2005) (same). As a result, Defendant likely will be released from custody in an untreated, delusional state. Although Defendant has caring family members willing to help her, it is not clear that she will accept that help. The Court worries that Defendant will return to her former conduct of placing liens on the property of those who do not conform to her delusional beliefs. The Court sees no satisfactory answer to this dilemma.

The Court will hold a hearing on **November 28, 2018, at 2:00 p.m.** Counsel for the government and Defendant, and the guardian ad litem, should be prepared to share their views on next steps in this case and any other relevant issues. Defendant should be present for the hearing, and defense counsel should notify Defendant's family members of the hearing so they can participate by phone if they desire.[5]

---

testified that Defendant's delusions cause no significant impairment to her activities of daily living. *See also* Doc. 95 (evaluation report stating that Defendant's "daily functioning is not markedly impaired apart from the impact of the delusions").

[5] The *Sell* hearings and submissions by the parties were sealed due to the private nature of Defendant's mental health condition. *See* Fed. R. Crim. P. 49.1(e) (the court may limit non-party access to court filings for good cause). But in light of the serious risk that Defendant again will place liens on the unsuspecting public, the Court concludes that the public interest in access to this order sufficiently outweighs Defendant's privacy

**IT IS ORDERED:**

1. The government's request to involuntarily medicate Defendant under *Sell* is **denied**.

2. A status hearing is set for **November 28, 2018 at 2:00 p.m.**

Dated this 7th day of November, 2018.

*David G. Campbell*
David G. Campbell
Senior United States District Judge

---

interests. The Court therefore will not place this order under seal; it will be accessible in the public docket. *See United States v. Sleugh*, 896 F.3d 1007, 1012 (9th Cir. 2018) (noting that filings under seal "interfere with open, public access to judicial records and documents" (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)).